GREENOUGH v. GREENOUGH.

1. DIVORCE—DIVISION OF PROPERTY—DISCRETION OF COURT—EVIDENCE.

   Plaintiff wife's claim of lack of effort and mismanagement on part of defendant husband in the development and construction of shopping center through funds or property supplied by her, incident to her claim of abuse of discretion of trial court in making a substantially equal division of property at conclusion of marriage lasting less than 10 years *held*, not substantiated by record presented on appeal.

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 17A Am Jur, Divorce and Separation § 931.
[3] 3 Am Jur, Appeal and Error § 770.
[4, 5] 17A Am Jur, Divorce and Separation § 931.

2. SAME—VALUE OF PROPERTY—FINDINGS OF COURT—EVIDENCE.

The findings of the trial court as to value of property involved in suit for divorce are upheld, where within the extreme estimates of the parties and evidence is not such as to show a different result should be reached.

3. APPEAL AND ERROR—APPENDIX—COURT RULES.

An appellant who fails to include in the appendix to the brief on appeal the testimony of an opposing expert witness on issue of valuation, a principal issue raised on appeal, falls short of the requirements of the court rules that such brief contain "parts of the record material to the questions presented" in order to make a "fair presentation of the issues presented" (Court Rule No 67, § 6; No 70, § 5, as effective January 2, 1957).

4. DIVORCE—DIVISION OF PROPERTY—EQUITY—CONTRIBUTION.

Division of property made by trial court in suit for divorce, including division made of household furnishings and effects, together with the equity in the residence *held*, not to have shown error on part of trial court, it being necessary that the division be equitable and that consideration be given to the contribution made by both parties.

5. SAME—DIVISION OF PROPERTY—CORPORATIONS—STIPULATIONS.

Division of property made by trial court in suit for divorce between parties who, with wife's daughter, owned all of the stock of a corporation whose assets were dealt with and inextricably mixed by the parties as their own, so as to award some of the corporate assets and discontinue, with prejudice, an action at law against it by the husband for reimbursement for special services rendered and asserting other claims *held*, not error, in view of the consent given the court to dispose of both cases and fact that the corporation has not seen fit to question the comprehensive decree.

6. APPEAL AND ERROR—DIVORCE—DIVISION OF PROPERTY—VEXATIOUS APPEAL.

Appeal from trial court's division of property in suit for divorce, involving questions of valuation and fair distribution *held*, not so lacking in merit as to sustain claim that the appeal was vexatious (Court Rule No 70, § 5, as effective January 2, 1957).

7. SAME—APPENDIX—PUNITIVE DAMAGES—REMAND.

Determination, as to whether punitive damages should be imposed upon appellant in suit for divorce for extensive omissions in her appendix and the amount of such damages, is not

made by Supreme Court, since it constitutes an action for money damages of considerable complexity within the framework of a case on appeal, but is remanded to circuit court from which appeal was taken, for determination of issues and recommendation to the Supreme Court (*Court Rule No 70*, § 5, as effective January 2, 1957).

Appeal from Oakland; Holland (H. Russel), J. Submitted June 12, 1958. (Docket No. 56, Calendar No. 47,563.) Decided December 2, 1958.

Bill by Grace I. Greenough against Clarence R. Greenough for divorce. Decree for plaintiff. Plaintiff appeals claiming error in division of property. Affirmed.

In respect to adequacy of presentation on appeal and whether penalty for inadequate record should be assessed, case remanded for determination of issues and recommendation.

*Abraham C. Rosen* and *Jeanne R. Twiss,* for plaintiff.

*William Cohen* and *Maurice Morse,* for defendant.

SMITH, J. There is little of law in this case and much of fact. It is a divorce action. The wife sued for divorce and got it. Neither party is complaining about that. The controversy rages over the property. The litigation has been protracted, some 8 law firms having participated therein. Plaintiff has enjoyed the services of 4, and defendant of an equal number. The trial chancellor observed, after "many hours of study of the exhibits herein (between 40 and 50, which include deeds, audits, leases, checks, et cetera) and the review of the days of testimony" that "to do complete justice in this case would require a chancellor of extraordinary perception plus

the combined efforts of skilled accountants and a real-estate specialist who could foresee the future." We agree.

The parties were married on May 29, 1947. There are no children of this marriage. Both had been married before. The plaintiff, the wife, brought property worth some $67,000 to the marriage. Part of this was real estate consisting of 12 lots on the north side of 12-Mile road in the city of Berkley, Michigan, and the McMehen building on the south side of 12-Mile road. The defendant, the husband, in the words of the trial chancellor, "brought little to the marriage in terms of money or property." He was, however, in the real-estate business (in fact, he and plaintiff first met on a business matter) and he brought to the marriage a business acumen and skill in this field, amply evidenced in the record before us. Even prior to the marriage, defendant managed plaintiff's property and assisted her in financial dealings involving the estate of Dr. Charles McMehen, her deceased former husband. Subsequently, defendant worked diligently to convert undeveloped property on 12-Mile road into a shopping center. The Greenough Corporation was formed in December of 1947, to hold the latter in corporate form in order to "buy, sell, mortgage, promote, build and lease real estate." At the time of entry of the decree of divorce, there were 3 stockholders in the corporation, namely, plaintiff, holding 9,913 shares, defendant holding, 9,912 shares, and plaintiff acting as guardian for her minor daughter, Margaret Ann McMehen, holding 10,575 shares. This corporation built and now owns the shopping center described in the litigation. The trial chancellor summarized defendant's activities in the creation of the shopping center in the following portion of his opinion:

"The former husband of the plaintiff (Dr. Mc-Mehen) as early as 1941 had made plans for a shopping center on the site of the present one owned by the Greenough Corporation. However, the land which came from Dr. McMehen's estate was not sufficient in size for the present operation. *More lots had to be acquired, an alley vacated, parking had to be provided and many changes made due to the changes in the concept of business centers.* The deeds for the needed land for the center were obtained December 31, 1946. In the spring of 1947 defendant commenced work on getting leases for the center. In December of 1947 the Greenough Corporation, a Michigan corporation, was formed, the stock in which is owned by the plaintiff, her daughter and the defendant. Said corporation did build and now owns a modern shopping center which is well described by words, pictures and drawing contained in exhibit 11, to which reference is made. The center was completed in the spring of 1949.

"After stressing the fact that plaintiff brought to the marriage money and property of the value of $67,358.53 some of which was used either directly or indirectly in bringing about the present financial status of the parties, attention is directed to some of the things done by the defendant:

"1. (a) Arranged for a mortgage on McMehen building of $32,000.

"(b) Upgraded tenants and rent in said building.

"2. Necessary additional lots (6) were acquired for the proposed center.

"3. Procured (with outside assistance) the 3 basic leases, and then lesser ones.

"4. Negotiated setback of alley (relocation of poles of phone company, Edison and Consumers Power).

"5. Attended to rezoning.

"6. Procured a promise of a $437,000, 4% mortgage from the Northwest Mutual Life Insurance Co. in February of 1948.

"7. Procured plans and specifications and got estimates for the center.

"8. Let contracts in March of 1948.

"9. Northwest Mutual mortgage reneged on loan and then defendant procured a commitment of $400,000 from Massachusetts Mutual.

"10. Procured a required completion bond from St. Paul Mercury Co.

"11. Massachusetts Mutual money ($400,000) was $85,000 short of what was needed—which created problem to be met.

"12. Litigation and liens contended with.

"13. Rents were assigned to Massachusetts Mutual who collected rents until June of 1953.

"14. Induced St. Paul Indemnity to take second mortgage which has been retired, et cetera.

"15. Procured final Prudential mortgage which took up existing mortgages and returned the management and collection of rentals to the parties hereto or to the officers of the corporation.

"It is not difficult to believe that during these days the defendant put in from 16 to 18 hours per day in the interest of the corporation. The plaintiff recognized, as was only fair and reasonable, the contributions of the defendant and so he was paid for his efforts, by being alloted by the issuance of stock, a 1/3 interest in said corporation." (Italics the court's.)

Having concluded that divorce was warranted upon the evidence, it was so decreed. As to property, the trial chancellor made a nearly equal division thereof between husband and wife. This is attacked by plaintiff as an "abuse of discretion" in various particulars, upon those of which meriting our attention we shall comment.

First, the mortgage referred to by the court as having been arranged by defendant is said to have been "procured by C. Harmon Company." We are referred to page 103a of the appendix as supporting this statement. The portions of page 103a referring to the matter are as follows:

"*Q.* Let's come down to the mortgage that you obtained, you say from the Provident Mutual Life Insurance Company on the McMehen building some years ago, was not Mr. Herman the man who made arrangements for the mortgage?

"*A.* His father was alive then and his name was Claud Harmon and Austin C. Harmon.

"*Q.* Did the mortgage, that is to say the Provident Mutual people, did they have an appraisal made of the building?

"*A:* The C. M. Harmon Company were and were the—

"*The Court:* You aren't answering the question.

"*Q.* Did they have an appraisal made, if you know, you can answer it yes or no?

"*A.* They must have had, they wouldn't make a loan without making an appraisal."

We fail here to find the support claimed.

Second, as to the acquisition of 6 additional lots for the shopping center, the plaintiff says "the defendant was employed by plaintiff prior to the marriage for such purpose although consummated with plaintiff's money after marriage." There is no impeachment of the court's conclusion in the statement.

Third, it is complained that "the basic leases referred to in item (3) were procured by Archie Morse, a real-estate broker, who received $5,600 for commissions." The record, however, merely shows that Mr. Morse assisted the defendant with respect to some of the leases.

Fourth, "the zoning and alley setback (4) (5) were matters of application to the city commission of Berkley and its common council." This is borne out by the record but its utility to the wife as a claim of error on appeal is not clear. The advisability of taking such action must be clearly shown to municipal bodies and this normally requires initiation, explanation, and negotiation. Such was the situation here. There was testimony, for example,

that the matter of the alley setback required "considerable negotiations" with the city council and city officials. It was an accomplishment properly considered by the chancellor.

The next claim of error is phrased in the following terms:

"The $437,000 mortgage referred to (6) was only a promise—and was an inducing factor to the builder of the shopping center to start building believing it was a definite commitment which resulted later in liens being filed and litigation with the architect and builder and mechanics when the mortgage money was not forthcoming; certainly as to (13) wherein the rents of the center were assigned as security for a new mortgage were not a credit to the defendant whose misstatement to the builder had created the litigatious situations resulting thereafter in the rents of the building being assigned for 4 years from 1949 to 1953 to the mortgage company referred to in (13)."

We are unable to find support in the record at the cited pages for the assertions made. The reference to "only a promise" is on page 124a. It reads, with respect to the mortgage, as follows:

"*Q.* Referring to your definition of a mortgage commitment, when you signed the McKinstrie contract, you had the promise of a loan of money?

"*A.* I certainly did, definitely, I had a letter from the vice-president of the Northwestern Mutual Life Insurance Company.

"*Q.* Did you tell Mr. McKinstrie you had a commitment for a $357,000 mortgage?

"*A.* I told him I had a firm commitment from the Northwestern Mutual Life Insurance Company.

"*Q.* For $375,000?

"*A.* I don't know as I told him the amount.

"*Q.* Did you tell him—

"*A.* What the amount was did not concern him.

"*Q.* Did you tell him that before you signed the contract with him?

"*A.* Yes, I certainly did, he wanted to know where the money was coming from to pay for it, I says, 'It is coming from a mortgage.'"

As to the belief in "a definite commitment" as a source of difficulty, to which we are referred to page 125a, we find nothing in the record so cited to justify the claim made. Apparently the effort here on the part of appellant is to establish mismanagement by the defendant. With respect to the liens and the need for additional capital, we find revealing testimony of the plaintiff herself:

"There was an original commitment from the Northwestern for $375,000 on a mortgage which did not go through.

"We later obtained a mortgage from Massachusetts Mutual and they proceeded with $400,000, and they proceeded with the building. In order to proceed with the building it was necessary to purchase 6 other lots which were purchased in the joint names of Clarence and Grace Greenough.

"Before the building was completed, we had trouble with the contractor. He needed more money than he originally estimated when we had started. There were a large number of mechanic liens placed on this property and litigation resulted from these mechanic's liens. It was necessary to formulate some policy and get further money from outside sources. Before this was done, however, Mr. Greenough obtained from the St. Paul Mercury a second mortgage and the St. Paul people put up a completion bond.

"Mr. Greenough took care of and did all the work necessary to obtain the company that did finally furnish a completion bond on that large amount and after they got the completion bond and these liens were filed and everything else, he persuaded the same company they better take a second mort-

gage on it to give enough money to finish the building. From the time of the second mortgage until some time in 1953 for about a year and a half, one of the terms was that the mortgage company were to collect the income and rental from the property. In order to get the rents from the property and income back into the Greenough Corporation where we could handle it, Mr. Greenough had to go out and get a final mortgage and he persuaded another mortgage company to give sufficient money to pay off the first mortgage and the second mortgage and to turn the property over so we would manage it once again.

"He obtained a mortgage of $410,000 at a low interest rate.

"*The Court:* Can't we specify the interest rate?

"*Mr. Cohen:* 4-1/2%.

"This happened in 1953. They turned over the management of the property and it finally rested in my hands and Mr. Greenough."

We have set forth these matters concerning the alleged mismanagement of the defendant in some detail in view of the fact that they form an essential part of plaintiff's charge that the trial chancellor abused his discretion in dividing the property as he did. We are not convinced of such abuse. None of the testimony quoted immediately above, we note, is contained in the appendix of the plaintiff in support of the questions she raises on appeal.

Plaintiff objects also to the finding of the trial chancellor that the net value of the corporate stock was $175,510, on the ground that exhibit 11, to which the court makes a reference, and the testimony of Mr. Sexauer, plaintiff's expert, indicates a net value of only $100,934. The trial chancellor, however, had before him also the testimony of defendant's expert, Mr. Schott, whose testimony would justify the higher value found. Plaintiff's failure to discuss this testimony, or, indeed, to refer to it, or print any portion of it in her appendix, falls short of the

requirement of Court Rule No 67, § 6,* that those "parts of the record material to the questions presented" be contained in an appendix to appellant's brief. See, also, Court Rule No 70, § 5.* There can be no "fair presentation of the issues" to the court when, on an issue of valuation, the testimony of an opposing expert witness is omitted.

Our observations in *Mitchell* v. *Mitchell,* 333 Mich 441, 445, are here equally in point:

"The testimony of witnesses varied widely as to these values. The trial judge arrived at amounts between the extreme estimates. In the absence of a showing that a different result would be reached in the light of this conflicting testimony, the findings of the trial court should be upheld."

We are not persuaded of error in the trial chancellor's valuation of the joint stock of the parties, nor in his award to plaintiff of all household furnishings and effects, together with the equity in the residence (valued at $20,000) upon her payment to the defendant of the sum of $10,000. The court's justification therefor is both well stated and well supported by the record:

"Said furniture was at one time appraised at $38,000, although the court feels that a more realistic figure would be $15,000. Some of said furniture belonged to the plaintiff prior to this marriage. The court has in mind that much of the $26,000, received by plaintiff from her Canadian island home went into the new home on Cedar Lake drive, some went for a car and some went into the joint account. Much money from the corporation, however, went into the furniture and furnishings in the new home and other places that inured to the benefit of plaintiff's property as opposed to corporate interest."

* Added October 30, 1956, effective January 2, 1957. 347 Mich xxii, xxx.—REPORTER.

It is unnecessary to burden this record further with additional matters of valuation of properties, and contributions of the parties thereto. As a matter of fact, the study we have given this record and the exhibits impress us not with error or abuse of discretion on the part of the trial chancellor, but with his patience and care. As we said in *Manigold* v. *Manigold,* 304 Mich 310, 314: "There is no rigid rule for division of property in divorce cases. Each case depends upon the particular facts involved." The division must be equitable and the contribution of both parties must be considered. *Whittaker* v. *Whittaker,* 343 Mich 267. Upon such principles we cannot say the trial chancellor was in error.

An additional claim of error remains to be considered. We have described the formation of the Greenough Corporation and listed the stockholdings therein, comprising the interests of the parties to the instant suit and plaintiff's daughter. This corporation was made defendant in an action at law by defendant herein under date of October 18, 1956, the declaration setting up defendant's alleged illegal removal as an officer, claiming reimbursement for special services rendered, and asserting other claims. The answer thereto, and cross declaration made certain denials and asserted cross charges, involving among other items, improper accountings, which would result, it was said, in tax deficiencies to be asserted by the Federal government. We mention these facts in partial explanation of paragraph 4 of the decree, providing as follows:

"It is further ordered, adjudged and decreed that the defendant, Clarence R. Greenough, forthwith dismiss and discontinue law action No. 40,936 in the Oakland county circuit court entitled 'Clarence R. Greenough v. Greenough Corporation, a Michigan corporation, with prejudice and without costs.'"

(This provision seems to be based on a stipulation of counsel relative to certain procedure. The stipulation is not before us and we are not informed as to its contents.)

It is now urged upon us that the decree disposes of corporate property in "disregard of the corporate being." Reference is made, among other items, to a Cadillac car, said to be owned by the corporation but awarded to defendant. (Plaintiff got the Oldsmobile.) Reference is made also to the statement of the court, in the valuation portions of its opinions, appraising and making allowance for certain of the tax liabilities of the parties and of the corporation. "The awards before set forth," asserts plaintiff, "constitute inroads into the capital structure of the Greenough Corporation." There is no need that we explore these alleged corporate inroads or decide whether or not the corporate veil of the corporation was improperly pierced by the trial chancellor. We feel constrained to observe, however, that the parties themselves dealt with corporate assets as their own and inextricably mixed their corporate and personal affairs, to the degree, in fact, that appellant (who now asserts error arising out of disregard of the corporate entity) prayed the trial chancellor as follows as "an equitable formula for dividing the property of the parties."

"Defendant to be awarded a judgment against the corporation in a sum to be determined by the court upon consideration of the factors set forth in paragraph 5 (1), (2) and (3), above."

We do not rule upon these matters, because of the positions taken by all parties in the trial court. We turn to appellant herself for summary thereof:

"The defendant, Clarence Greenough, had filed a lawsuit against Greenough Corporation, a Michigan corporation, alleging an indebtedness to him for

salaries, commission, management services and as set forth therein; the corporation had filed its answer to the declaration and had filed a cross declaration against the defendant asserting various acts of misappropriations as therein set forth. When the divorce case came on for trial, there appears to have been a consent that the court dispose of both cases. The decree of divorce provides that keeping with the stipulation of the parties, defendant shall dismiss his law action No. 40,936 against the Greenough Corporation, a Michigan corporation, with prejudice and without costs."

The trial chancellor, with this "consent that the court dispose of both cases," involving, it is observed, both the plaintiff's suit and the corporation's countersuit, did just that in one comprehensive decree which the corporation itself has not seen fit to question in any manner, if, indeed, it is in any position so to do upon this record. We are not persuaded that there was error in the distributions made.

The decree is affirmed, with costs to appellee.

Our adjudicative process is now at an end and we are asked, pursuant to the new rules,* to assume the penalizing function.

It comes about in this way: Under the old rules we were transmitted a certified record upon which decision was rendered. It contained the substance of the controversy "such parts of the testimony and proceedings * * * as may be necessary." (Old Court Rule No 66, § 7 [1945].) It was certified by the trial judge, who had a right (frequently exercised) to insist that it contain all material necessary adequately to present the issues for review. (See Honigman, Michigan Court Rules Annotated, comments to Rule No 66, § 12, p 638.) In other words, the person best qualified to know the issues, the trial judge, was charged, as well as the parties, with the

---

* See 347 Mich xiv *et seq.*—REPORTER.

responsibility of seeing that the record as to such issues came properly before us.

Under the new rules, however, such is no longer the case. The parties bring up only such parts of the record as they choose to bring up. If our Court wishes to get the complete account of the proceedings it must refer to the transcript, of which there is only one copy for all members of the Court. The clear intent of the new rules, of course, is the transmission to the Court as before, of all pertinent and material parts of the record. The omissions are to be only those portions of the record which have no bearing upon the issues presented to the trial court. (See Honigman, Court Rules Amended, 35 MSBJ, No 11, pp 36, 38 [1956].) Should one of the parties, however, either by ignorance or design, choose to submit a patchwork of disconnected testimony, corrective measures must be applied. We might possibly entertain a motion by appellee for an order directing the appellant to print the necessary portions of the record. It would then become our responsibility to rule upon what should be contained in the appendix and what might be excluded therefrom. This determination would require a painstaking study of the entire transcript, necessarily (to avoid "one-man" opinions) by each member of the court in rotation, since there is only one copy of the transcript. A very little of this and the appellate process stops.

There is at least one other alternative: The opposing party prints in his own appendix the parts omitted in gross disregard of the "requirements of a fair presentation of the issues to the Court" and then moves this Court for punitive damages (Court Rule No 70, § 5) for his wrongfully-caused labor and expense. This, also, throws the matter of what should be in the record squarely up to this Court. Again, the trial transcript must be reviewed page by page in the light of the issues presented. Was the

testimony of witness A necessary to the first issue? All of it? How much was cumulative? How directly related to the issue must it be? Will we penalize counsel for an honest mistake of judgment as to any of this? We now proceed with the same determinations for issue under number 2, then issue number 3, and so forth. This accomplished, we examine the exhibits one by one. Our appellate processes with respect to docketed cases from the entire State, of course, come to a halt while we determine what should have been contained in the record of one individual appellant against his appellee.

We have commented upon these matters in some detail in order that the profession may realize the importance (if the new rules are to survive) of adherence to the principle of fair presentation. In retrospect, indeed, the procedure under the old rules, whereby we were furnished a narrative record of the trial, seems easily understood, simple, and expeditious. Should it often be necessary to order a trial on the appendix-damage issue (hereinafter discussed), the procedure under the new rules will be more time-consuming and expensive than that under the old. See, also, *Miller* v. *Allen,* 352 Mich 95, and the supplement attached to our opinion in *Wilks* v. *Kempf,* 352 Mich 445, 451–453; *McGuire* v. *Rabaut,* 354 Mich 230.

The second alternative above referred to was here adopted. We now have before us, as a part of the instant proceedings, the following from the appendix of appellee:

"This counter appendix was made necessary because the appellant has failed to include in her appendix such other parts of the record indispensable for a consideration of the questions presented. Appellant's appendix is grossly lacking in the requirements of propriety and flagrantly disregards the court's mandate for a fair presentation of the issues

to the court, as provided by Michigan Supreme Court Rule No 67, § 6, and Rule No 70, § 5.*

"The principal and substantial issue in this cause is the fairness of the court's apportionment of the property to each of the parties to this cause. The matter of cruelty charged by each party against the other is not the controlling issue. Neither side is contesting the divorce decree on that point. The appendix is unnecessarily prolix as to the matter of cruelty, which is not involved in this appeal, but is patently inadequate as to the principal matter in issue, namely, the propriety of the division of the property made by the court. The appendix as prepared by the appellant as it will obviously appear, is distorted, and does not give a fair presentation of the issue, namely, the award made by the court in the decree.

"In support of our charges, we need only point out some instances of the gross disregard of the requirements of propriety and fairness in the presentation of matters essential for the Judges of the Court to read in order to decide this issue, the omissions by the appellant from her appendix of the following testimony vital to an appraisal of the trial court's fairness:

"A. Cross-examination of appellant.

"B. Cross-examination of Walter Karal (appellant's witness who was the C.P.A. for the appellant and the corporation owning properties involved in case).

"C. Considerable of the direct testimony of Walter Karal.

"D. Cross-examination of George Sexauer, appellant's only real-estate expert.

"E. Direct examination and cross-examination of Sidney Schott, real-estate expert for appellee.

"F. Parts of direct and redirect testimony of appellant relating to important issues and required for the Court to read.

"G. Most of the direct testimony of appellee and the parts of the cross-examination.

---

* See 347 Mich xxii, xxx.—Reporter.

"H. Parts of the cross-examination of Nathaniel McKinstrie, appellant's own witness who was contractor for the erection of the shopping center involved in the property settlement.

"Considerable of this omitted testimony was damaging to appellant's theory on appeal.

"The record in this cause discloses that there was delay after delay on the part of appellant, not only in the trial of this cause, but even some delay in the appellate steps taken in this cause, the evident purpose of the appellant is to cause continuing hardships to befall the appellee and to deprive him of his just rights.

"The conduct of the appellant is not only against the expressed rules of this Court but in violation of its spirit. Mr. Jason Honigman has justly said that this Court (1957 Pocket Part of Michigan Court Rules Annotated, pages 164, 165, and 170):

" 'May moreover exercise its disciplinary powers as hereinafter described, where either appellant or appellee have grossly neglected their obligation to print in the appendix those matters which are necessary for a fair presentation of the issues on appeal.' Rule No 70, § 5. [35 MSBJ, No 11, p 38.]

"The appellant should not print:

" 'All portions of the testimony or record which have no bearing on the issues presented to the appellate court.'

"Mr. Honigman states:

" 'This Court asserts its intent to take disciplinary action where there has been a gross disregard of the requirements of propriety or fairness in the presentation of matters to the Court. By the adoption of this section the Court has given notice that it intends to exercise the inherent power which it always had to enforce disciplinary action in cases of misuses of the processes of the Court.' [35 MSBJ, No 11, p 40.]

"and,

" 'The gross abuse of the appellate processes.'

"Mr. Honigman further states, that:

*" 'By this rule the Court may assess punitive damages, including reasonable attorney's fees, and the award of an additional amount not to exceed 10% of any judgment for money damages. In addition, the court may take such other disciplinary action as it may see fit.'* [35 MSBJ No 11, p 40.]

"It is very apparent that the appellant has lifted out of the context of this record only such narrowed and limited testimony to slant and accommodate the desires of the appellant with utter disregard of the rules of this Court and the insistence of this Court for a fair presentation of the matters in issue.

"This appellee has no moneys required for the printing of the appendix or brief filed in his behalf, but because of the importance of avoiding any further time elapsing in securing the decision of the Court on this appeal, it may be inferred others are paying for the printing of the enlarged appendix and the brief, and will await the final decision of the Court on the appeal as to the matter of costs.

*"If there were ever a case that called for disciplinary action by this Court, and the assessment of the additional 10% of the award made by the decree of the trial court in favor of the appellee, this is one."*

Court Rule No 70, § 5,* above referred to, reads in its entirety as follows:.

"5. The court may, upon its own motion, or the motion of any party, dismiss an appeal, assess punitive damages or take other disciplinary action when it has been determined that an appeal or any of the proceedings therein was vexatious by reason:

"(a) That the appeal was taken for the purposes of hindrance or delay or without any reasonable basis for belief that there was a meritorious issue to be determined on appeal; or

"(b) That any motion, argument, petition, brief or appendix filed in the cause was grossly lacking in the requirement of propriety or grossly disregarded

---

* See 347 Mich xxx.—Reporter.

the requirements of a fair presentation of the issues to the court.

"Punitive damages as herein provided shall not exceed an amount equivalent to actual damages and expense incurred by the opposing party, including reasonable attorney's fees, and an added amount not exceeding 10% of any judgment for money damages awarded in the lower court or tribunal."

With respect to subsection (a), we are not prepared to hold on the record made to us that the appeal was so clearly taken for purpose of delay, or without reasonable basis for belief in its merits, that it should be penalized. On the latter issue the case is a close one, going to the very verge of permissible action in the light of the showings made, but questions of valuation and fair distribution are difficult to assess and we are not persuaded of such utter lack of merit as to warrant action under subsection (a).

The issues presented under subparagraph (b) remain for determination. That there were extensive omissions in appellant's appendix is obvious. But not every omission, even though extensive, will justify the imposition of punitive damages. Where appellee prevails, as here, his costs of printing his appendix may be recovered as taxable costs. For punitive damages we require, in addition to the omission itself, the existence of wilful or reckless disregard of the rules, or violations so widespread as to impeach other reasonable explanation. We are in the realm of the *bona fides,* of good faith or bad. Should such violation be found, a money award is to be made, the elements of which are set forth in Court Rule No 70, § 5. What we actually are confronted with is an action for money damages of considerable complexity within the framework of a case on appeal. This Court will not conduct the trial of such case, take the testimony, or weigh the evidence. The matter is remanded to the circuit court for the county

of Oakland, from whence it came, for a determination of the issues and a recommendation to us with respect thereto. We will then make the decision prayed under Court Rule No 70.

DETHMERS, C. J., and CARR, KELLY, BLACK, EDWARDS, VOELKER, and KAVANAGH, JJ., concurred.