WILKS *v.* KEMPF.

1. APPEAL AND ERROR—QUESTIONS REVIEWABLE—FRAUD—BURDEN OF PROOF—WAIVER.

Whether or not defendant had waived fraud he alleged plaintiff had committed is not considered, where it is determined that defendant had failed to sustain his burden of proof that plaintiff had committed the fraud alleged.

2. FRAUD—FALSITY OF REPRESENTATION—BURDEN OF PROOF—EVIDENCE.

Evidence, presented by defendants in plaintiffs' suit to collect sums paid under oral agreement incident to resumption of operation of hardware business originally sold to defendants, failed to support defendants' burden of proof that plaintiffs were guilty of fraud in the original transaction, where they failed to prove the falsity of the representation as to amount the business had made per year.

3. SAME—BURDEN OF PROOF.

One carrying the burden of proving his own allegation of falsity of representation may not cast such burden to the shoulders of the one he has accused of fraud:

4. APPEAL AND ERROR—QUESTIONS REVIEWABLE—FRAUD—PLEADING.

Contention by plaintiffs that defendants had made fraudulent representations as to accounts payable and accounts receivable incident to amicable repossession of business by plaintiffs of hardware business they had sold to defendants is not considered, where there is no charge or hint of fraud in plaintiffs' bill of complaint.

5. COSTS—FAILURE TO PREVAIL IN FULL ON APPEAL.

No costs are allowed on appeal, where neither party prevails in full.

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 3 Am Jur, Appeal and Error § 824.
[2, 3] 24 Am Jur, Fraud and Deceit § 255.
[5] 14 Am Jur, Costs § 97.

Appeal from Muskegon; Beers (Henry L.), J. Submitted April 17, 1958. (Docket No. 39, Calendar No. 47,522.) Decided June 11, 1958.

Bill by Cecil N. Wilks and Violet R. Wilks against Ledford E. Kempf and Marianna Kempf praying for subrogation and reimbursement of sums paid to defendants' creditors on repossession of store which plaintiffs had sold defendants. Cross bill. alleging fraud in connection with sale of business and asking damages. Decree for defendants. Plaintiffs appeal. Reversed and remanded for dismissal of both bills.

*Reber & Reber,* for plaintiffs.

*Smedley & Spaniola,* for defendants.

BLACK, J. The facts we have gleaned from the original record, and the appendices,* are presented in chronology as follows:

Plaintiffs (Mr. and Mrs. Wilks) were owners and operators of a retail hardware business in the Muskegon county village of Holton. They owned and still own the business premises. October 15, 1953, in pursuance of precedent negotiations and without executed writing at the time, plaintiffs sold the business to defendants (Mr. and Mrs. Kempf) and one Bond for the agreed price of $30,000. Defendants and Bond—each contributing $1,500—paid $3,000 down. Simultaneously the business premises were orally let to defendants and Bond† as lessees. Transfer of possession of the inventory and assets of the business, and commencement of the tenancy, took place on the above date. Defendants (Bond participating

---

· * See the supplement at end of this opinion.

† Bond withdrew from the venture shortly after. His rights and obligations, if any, are not in issue and he is not a party to this litigation.

for a short period) thereafter paid, and continued to pay for some months, monthly purchase instalments as orally agreed by the parties.

Following discovery that the business inventory had been originally and erroneously represented— by Mr. Wilks to Mr. Kempf—as being worth the sum of $16,000, the present litigant parties entered into a modified agreement of purchase, which modified agreement was reduced to several related writings. The new agreed purchase price—of the business— became $16,000. A bill of sale reciting such consideration was executed by plaintiffs in favor of defendants. Defendants executed a promissory note payable to plaintiffs in the principal sum of $11,850, calling for monthly instalments of $50 each and requiring an additional lump-sum payment of $5,000 on May 1, 1954. A chattel mortgage was executed to secure the mentioned note and, at the same time, a formal term lease of the store premises was duly executed; plaintiffs being named as lessors and defendants as lessees. Excepting as to the bill of sale (it was executed February 6, 1954), all of these papers were executed February 8, 1954. The lease was keyed to the chattel mortgage in such way as to terminate the tenancy when the note and mortgage were paid. The lease granted, to Mr. and Mrs. Kempf as lessees, an option to purchase the demised premises in accordance with terms of no present concern.

The business did not pan out according to sanguinary statements of Mr. Wilks and hopeful expectations of Mr. Kempf. Due date of the lump sum payment being imminent, and defendants being unable to pay, the parties entered upon an oral agreement whereby plaintiffs agreed to and did take over the business. The lease was thereupon terminated (by agreement or by force depending on viewpoint) and certain detail-disputed undertakings of the par-

ties were agreed upon. Defendant Ledford Kempf relates his version of such oral agreement as follows:

"*Q.* What discussion did you have with Mr. Wilks about his taking back the store?

"*A.* Well, as I recall it he was working on the Johnson house at the time, and I went down and talked to him and asked if he thought this Mr. Schwendiman would still buy it, and—because he was interested in it at the time I was, and said that we had decided we didn't want to go any further and knew it was going to be a burden, if we kept it, at the 1st of May.

"And he asked what the payables and receivables were, and I told him that roughly I figured they were around $3,000 payable and $1,000 receivable, and he said: 'Well, if it's all right with you —' he made this suggestion, that he would take it back and pay those bills, and take the accounts receivable, and we would forfeit our down payment.

"*Q.* Is that all that you discussed?

"*A.* Yes.

"*Q.* Did you ever agree to that?

"*A.* Yes, I would say so."

We gather from plaintiffs' brief that they do not dispute defendant Ledford Kempf's quoted testimony, and so arrive at the facts of relevant controversy. Some months after plaintiffs took over the business and business property a dispute arose as to the nature and amount of obligations plaintiffs had assumed by their agreement to "pay those bills." Plaintiffs thereupon filed this bill which, according to opening statement below of their then counsel, was purposed toward subrogation of plaintiffs "to certain accounts which they paid which were the obligations of the defendants, and which they were forced to pay by reason, we will show, to protect their interests of certain property on which they had

a mortgage, a chattel mortgage and a lease, and we're seeking to recover that account."

Defendants countered with a cross bill, alleging that they were induced originally to purchase and take over conduct of the business by fraudulent representation of plaintiffs that "the business had an annual income of something like $18,000 * * * and that the business was a going business which produced an excellent income." These issues came to trial in the Muskegon circuit and resulted in a decree dismissing plaintiffs' bill and upholding defendants' cross bill. Defendants were granted a money decree against plaintiffs, made up of their down payment as mentioned and other lesser items, aggregating in all $6,364.65. Plaintiffs appeal.

Stated and counterstated questions present 2 issues. The first is whether defendants, carrying as they do the burden of proof of fraud as alleged in their cross bill, have sustained such burden. The other, posed on assumption that defendants did sustain such burden, is whether the final oral contract operated as a waiver of such fraud. We find it unnecessary to decide the second question, the first being decisive.

Accepting defendants' claim that plaintiffs did, in the inducement, represent that they—plaintiffs—"had made $18,000 a year out of the store," and assuming that such representation if untrue would amount to fraud, we find no evidence of falsity of such representation. Defendants have proceeded on the erroneous assumption that plaintiffs were bound to produce proof supporting their said representation; whereas and under well-known evidentiary principles defendants were obliged to prove this linchpin—falsity of the representation—of their alleged cause. They failed utterly in such regard and insist here, in lieu of such required proof:

"If Wilks had made $18,000 a year out of the store, or $5,000 in the last 3-1/2 months, they could easily have proved it by their income tax records and returns, their books of accounts, their business tax, and sales tax records. Wilks offered no proof whatsoever that he did make it. Wilks never contradicted one word of testimony offered by or for defendants. The truth must be that he did not make the profit he represented he did."

One carrying the burden of proving his own allegation of falsity of representation may not thus cast such burden to the shoulders of another he has accused of fraud. For such reason it must be held that defendants failed to make out a case of fraud against plaintiffs. It follows that the cross bill must be dismissed.

So far as plaintiffs' bill is concerned, feeble evidentiary support thereof is submitted, by brief or otherwise. Plaintiffs seek to sustain it principally on ground that Mr. Kempf, to induce the final (oral) agreement, fraudulently represented "that the outstanding bills payable to be assumed by the plaintiffs were $3,000 and that the bills receivable taken over by the plaintiffs were $1,000." (Quotation from plaintiffs' brief.) There is no charge or hint of fraud in plaintiffs' said bill* and we decline accord-

---

* The gravamen of plaintiffs' grievance against defendants appears in paragraphs 5 through 8 of the bill. Such paragraphs read:

"5. That on or about the first of April, 1954, plaintiffs to protect their rights, investments and securities were forced to repossess the premises, and the items covered by the chattel mortgage excuted by and between the parties to this action.

"6. That plaintiffs to protect their security and rights of ownership acquired by such repossession and to avoid legal entanglements were forced to pay debts and obligations incurred by the defendants and did pay the debtors and amounts as shown by the attached schedule, marked exhibit D and made a part of the pleadings hereof.

"7. That the debtors so paid by the plaintiffs and the amounts shown opposite their respective names should have been paid by the defendants and were the obligations of the defendants.

"8. That the plaintiffs are legally subrogated to the debtors for the amounts set forth opposite each debtor's name, and plaintiffs are legally entitled to reimbursement from the defendants in the sum of $4,606.92."

ingly to consider the quoted contention. The chancellor decreed that plaintiffs were not entitled to relief. We agree.

Reversed and remanded for entry of decree dismissing plaintiffs' bill and defendants' cross bill. No costs.

DETHMERS, C. J., and CARR, KELLY, SMITH, EDWARDS, VOELKER, and KAVANAGH, JJ., concurred.

*Supplement:*

We are constrained to record that appellees' brief has narrowly missed an expunging order for want of compliance with Court Rule No 68 (1945), as amended. The counterstatement of facts set forth therein is devoted in approximate entirety to unadulterated argument,* distinct from informative and page-referred facts per requirement of section 2 of said rule. Both appendices being devoid of fair continuity of testimonial expression upon appellants' page-referred fact-subjects, the result is that we have been compelled to choose between (a), acceptance of appellants' set-forth-in-brief statement

---

* The first 6 paragraphs of appellees' "Counterstatement of Facts" fairly exemplify the tone of noncompliance with section 2 of Rule No 68. They read:

"The opening sentence is not correct unless it is an admission of plaintiffs' fraud.

"Fraud is always a question of fact. Defendants charged plaintiffs with fraud and plenty of it. Plaintiffs never offered one word of testimony in opposition to any of the defendants' charges.

"Whether or not there was representation, the materiality of representation, the falsity thereof and the reliance thereon are all questions of fact. Waiver is likewise a factual question.

"Contrary to what is stated in the first paragraph on page 3 of plaintiffs' brief, this case does not arise out of a sale to 'defendants' and the Bonds. This case does not involve the Bonds, only the Kempfs.

"Then too there is considerable dispute as to the price of the 'subject matter of the sale.'

" 'Tis true plaintiffs' suit was brought 'to obtain a money decree for moneys paid to creditors of defendants,' but paying creditors was the very thing that plaintiffs agreed to do."

of facts, or (b), ascertainment of essential facts from the original record. The latter course having been chosen, it would appear that the following general observations are in order.

The vital importance of carefully prepared statements and counterstatements of fact, and of appendices, for printing in accord with new Court Rules No 67 through 69,* cannot be overstressed. Under these rules (effective January 2, 1957), and quite unlike corresponding rules in previous effect, each member of our Court receives only that which counsel, proceeding separately or by agreement, choose† to send here in the form of appendices or a joint appendix. One copy only of the record proper —it is the original record with included transcript— arrives for use. In case of brief-dispute or doubt upon material facts, such record must be passed around, among members of the Court, to such extent as may be necessary for resolution of such dispute or doubt. So, when counsel ignore the rather plain purpose and intent of these rules (that the appendix or appendices be made comprehensively informative with accurate page-referred keys thereto in the briefs), this Court of necessity must dig out, from the original record, such of the known facts—disputed or undisputed—as are "necessary to an understanding of the nature of the controversy and of the questions involved on the appeal." Needless to say the draftsmen of these new rules, and this Court in turn, did not intend any such time-consuming, decision-delaying and wholly uncalled-for result. See "Author's Comment" in the 1957 supplement to Honigman's Michigan Court Rules Annotated (pages 164, 165). Counsel accordingly will aid us by looking at their intended statements of fact and appendices

---

* See 347 Mich xxii–xxviii.—REPORTER.

† Aside, of course, from the specific requirements of said Rules Nos 67 and 68.

as if they—counsel—were strangers to the locale of the involved facts and quite unfamiliar with the flowing "life" of the case as known to courtroom participants. Doing so, it is likely that our needs on review and the cost-reducing purposes of the new rules may be supplied and attained with mutual satisfaction (see our opinion in *Miller* v. *Allen,* 352 Mich 95).