MAHLEN LAND CORPORATION *v.* KURTZ.

1. APPEAL AND ERROR—QUESTIONS REVIEWABLE—EXHIBITS.

The Supreme Court considers, at law or in chancery, only those exhibits properly received below, or as to which assignments of error have been made, either specifically or under the statement of questions involved (Court Rule No 67 [1945]).

2. SAME—CONDUCT OF TRIAL.

The Supreme Court presumes that a trial judge is fair and honest in the conduct of a trial and a litigant who would impeach that presumption assumes a heavy burden.

3. SAME—PERSONAL ANTAGONISM TOWARD LITIGANT—RECORD.

Claim of personal antagonism on the part of the trial court toward defendant, the former secretary of plaintiff corporation, *held,* not to have been sustained by record in suit against him for an accounting and surrender of corporate assets, prejudice or bias on the part of the trial court not being inferable by the Supreme Court solely from decisions made by the trial court in the due course of judicial proceedings.

4. CORPORATIONS—OFFICERS—DIRECTORS—TERM OF OFFICE.

An officer or director of a corporation retains office until his successor duly qualifies.

5. SAME—MEETING OF BOARD OF DIRECTORS—DEMAND FROM SECRETARY.

The failure of 2 directors to attend a subsequent and regularly called meeting of the board of directors would not invalidate action taken at such meeting whereby the then secretary was directed to demand from defendant, the former secretary, corporate assets, books and records.

6. SAME—DIRECTORS—OFFICERS—STOCKHOLDERS—ASSETS.

A director, officer, or stockholder may not retain corporate assets against the will and direction of the governing body of the corporation.

REFERENCES FOR POINTS IN HEADNOTES

[1] 3 Am Jur, Appeal and Error § 591.
[2] 3 Am Jur, Appeal and Error § 934.
[3] 3 Am Jur, Appeal and Error § 899.
[4] 13 Am Jur, Corporations § 872.
[5] 13 Am Jur, Corporations § 960.
[6] 13 Am Jur, Corporations § 962.
[7] 13 Am Jur, Corporations § 998.
[8, 9] 13 Am Jur, Corporations § 1217 *et seq.*
[11] 13 Am Jur, Corporations §§ 972, 1018.
[12] 12 Am Jur, Contempt § 29.

7. SAME—CONTRACTS—DIRECTORS—BURDEN OF SHOWING FAIRNESS.

The burden of showing that a contract between a corporation and one of its directors, or with a group of which such director is a member, is fair to the contracting parties is upon such director or group (CLS 1956, § 450.13).

8. SAME—SALE OF ASSETS—APPROVAL.

Finding of trial court that cross plaintiff had approved sale of corporate assets to children of other directors at a discount *held,* supported in suit wherein cross plaintiff complained of such sales when accounting by him was sought as to corporate assets he himself had withheld.

9. SAME—SALE OF ASSETS—RATIFICATION BY STOCKHOLDERS.

Sale of topsoil from plaintiff corporation's property to one of its directors *held,* not to have been subject to complaint by defendant and cross plaintiff, the corporation's former secretary, where it appears the action was approved and ratified at the next annual stockholders' meeting.

10. SAME—COLLECTION OF DEBTS—FRAUD.

No action is ordered taken by corporation with respect to collection of balance due corporation from one of its directors arising from sale of topsoil from corporate land, where there does not appear to be fraud involved.

11. SAME—MISAPPROPRIATION OF ASSETS.

Claimed misappropriations of corporate assets on part of cross defendant directors of plaintiff corporation *held,* not to have been substantiated by testimony presented by cross plaintiff upon whom burden of proof was cast and who had joined in the ratification and approval of the transactions now sought to be questioned.

12. CONTEMPT—SALE OF STOCKS—POSTING OF BOND.

Defendant, former secretary of plaintiff corporation, was properly found guilty of contempt for not complying with court order requiring him forthwith to sell specified stocks in outside corporations or post a bond in a specified sum conditioned upon his ultimate delivery of such stocks to plaintiff plus dividends and possible differences between highest bid price on day of order and lower market value on date of delivery.

13. CORPORATIONS—DISSOLUTION—RECORD.

Record in suit in which dissolution of corporation, in addition to other relief, was sought, *held,* not to disclose exceptional circumstances warranting dissolution.

Appeal from Wayne; Fitzgerald (Neal E.), J. Submitted October 16, 1958. (Docket No. 4, Calendar No. 47,516.) Decided February 19, 1959.

Bill by Mahlen Land Corporation, George H. Pastor Development Co., both Michigan corporations, and A. Jerome Geisler against Paul Kurtz, a former officer of the Mahlen Land Corporation, for accounting and to compel surrender of corporate assets. Cross bill, with Tillie Betty Kurtz added as defendant and cross plaintiff and Florence Geisler, George H. Pastor and Mahala L. Pastor, stockholders of the Mahlen Land Corporation, added as plaintiffs and cross defendants, for accounting, enforcement of personal obligations to the corporation, and for dissolution of the corporation. Decree for plaintiffs. Defendants appeal. Affirmed.

*Milton M. Maddin,* for plaintiffs.

*Fred J. Potvin,* for plaintiffs Geisler.

*Walter M. Nelson,* for defendants.

Smith, J. This matter involves alleged wrongdoing with corporate assets. The legal principles involved are well established. The facts are somewhat more involved, due, primarily, to irreconcilable differences in the testimony of witnesses.

The bill of complaint, filed by the Mahlen Land Corporation (Mahlen), George H. Pastor Development Company (Pastor), A. Jerome Geisler, Florence Geisler, George H. Pastor, and Mahala L. Pastor, charged that defendant Paul Kurtz (Kurtz) "as the then secretary obtained and retained in his possession some of the corporate property and assets including, among other things, stock purchased by Mahlen Land Corporation in other corporations

having a value in excess of $100,000;" that Mahlen needed the assets in order to discharge certain obligations; that the successor secretary-treasurer, A. Jerome Geisler, pursuant to the orders of the board of directors, had demanded of Kurtz "the return of said corporate property and assets in accordance with the direction of the board of directors of Mahlen Land Corporation," but was met with refusal, that Kurtz "informed plaintiff Geisler that he was retaining same in his personal safe-deposit box and refused and failed to deliver same over to said secretary-treasurer of said Mahlen Land Corporation and continues so to do." The bill prayed accounting and surrender of assets.

The pleadings filed by defendant Kurtz (adopted by his wife, Tillie Betty Kurtz, who appeared as defendant and cross plaintiff) are summarized in his brief as follows:

"Kurtz's answer to the bill charged that any lack of cash in the treasury of Mahlen was 'deliberately brought about by the fraudulent dealings' of Pastor and Geisler and that payment 'of *their* long overdue obligations' to Mahlen would supply all needed cash.

"Kurtz charged that plaintiffs 'were engaged in continuing the fraud on' Mahlen of failing to pay their 'long overdue obligations * * * to said Mahlen' and that plaintiffs 'were not acting in good faith.'

"Kurtz charged Pastor and Geisler with 'refusing to collect overdue substantial sums from persons associated with them.'

"Kurtz charged that since the purpose of the organization of Mahlen had been accomplished and that dissolution and distribution were in order, Pastor and Geisler were not the proper persons to, manage liquidation because they themselves were indebted to Mahlen for misapplication and misappropriation of about $150,000.

"Kurtz's cross bill charged wrongful use by Pastor and Geisler 'of a majority of the stock of' Mahlen

and 'of their majority on its board of directors in continuous and flagrant breach of the understanding among the parties' in respect to the use of Mahlen money as set forth in paragraph 8 'and in violation, disregard and derogation of their duties as fiduciaries, officers and directors of Mahlen' in deliberate fraud of cross plaintiffs and of their rights, all to the advantage of Pastor Company, the Pastors and the Geislers.  *  *  *

"Kurtz's cross bill prayed for an accounting, for *judgment*, for *dissolution*, a receiver and general relief." (Italicized matter in quoted source.)

We need not further summarize the pleadings, the primary issues appearing herefrom. The trial chancellor's decree was in favor of plaintiffs and defendants have appealed. Before us also is an appeal from "the judgment, sentence and order dated October 23, 1956, of said Court in the above-entitled suit finding him [Paul Kurtz] guilty of contempt by failure to perform an order herein dated March 29, 1956."

These are the outlines of the controversy. Such additional facts from a lengthy record, the files of 2 additional related cases certified to us, and the 2 volumes of exhibits* will be referred to insofar as

---

* Plaintiffs' reply brief lists some 19 defendants' exhibits forwarded us, "most of which were not offered, some of which were not received and others although received by the lower court in their original form, contained personal notations of Mr. Kurtz not properly a part of the record, and specifically excluded." In reply defendants argue, in part, as follows:

"It is conceded that generally admissibility of exhibits should be and is determined in the trial court subject only to review in the appellate court of the correctness of the orders. The nature of this trial prevented counsel from giving to the schedule of exhibits the attention it requires and ordinarily receives.

"As the appellate court hears chancery appeals *de novo*, the admissibility of exhibits or portions thereof is for the appellate court to determine on the record made. No complaint can be made of the Supreme Court considering, on the record, the documents (mainly unquestioned) that were before and were considered by the trial court."

The arguments made reflect an erroneous concept of our practice. This Court considers, at law or in chancery, only those exhibits properly received below, or as to which assignments of error have

we deem them relevant and material to the controlling issues.

We find it necessary to comment at the outset upon a phase of the case to which defendants devote a great deal of attention, namely, the so-called attitude of the trial chancellor toward them and their counsel. Defendants' principal witness was Paul Kurtz. The parties before us seem to agree that his testimony lacked consistency but ascribe the lack of consistency to different causes. According to defendants, it was the skill of plaintiffs' counsel. "Mr. Maddin," it is said, "early demonstrated that he could get Kurtz as a witness to appear to go around the full circle of at one end answering 'yes' and at the other end answering 'no,' or the reverse. But at once it appeared that this mannerism of Kurtz (and the questioner) had very little to do with his credibility as a witness." With this conclusion plaintiffs do not agree. They assert that their counsel "tried many cases in his 31 years of practice, but has never encountered a witness so lacking in respect for the court, judicial proceedings and the truth." The trial chancellor's conclusions were expressed as follows:

"The testimony of defendant Kurtz is practically the sole support of the cross bill. The charges of misfeasance and malfeasance against the plaintiffs grew out of a combination of the Kurtz auditor's investigation, plus Kurtz's own deductions therefrom. These charges were made in 'shotgun' style. Every check issued by the plaintiffs was made the basis for claim of wrongdoing on their part. Time after time Kurtz was forced to admit that most of them were absolutely baseless in fact, and that he actually knew nothing about the subject matter. The net result of these reckless and irresponsible charges, and futile

been made, either specifically or under the statement of questions involved. (Court Rule No 67 [1945].) Those not meeting such requirements have been stricken from our records.

attempts to support them on the stand, was to render the testimony of Kurtz practically valueless. His constant attempts at evasion, and his reluctance to answer questions which necessitated damaging admissions on his part, slowed down the trial and swept away whatever credibility his testimony might otherwise have possessed. The court is forced to conclude that Mr. Kurtz felt that if he made as many charges and allegations of wrongdoing as possible, some of them would be bound to stick. The court cannot agree with him. The convincing proof is lacking. He asserted much, but proved nothing."

In this Court defendants repeatedly attack the chancellor as antagonistic to them and we are cited to many excerpts from the record in alleged support thereof. Since it would be unfair to quote remarks by court, counsel, or witnesses except in fairly full context, and since practical limitations of space preclude the inclusion of a great deal of the lengthy record, we will set forth in detail only those matters initially complained of—those occurring at or near the start of the trial. The circumstances do not vary greatly as the trial progressed. It is urged to us, then, that "the trial court early and continuously showed a deep and irrepressible personal antagonism toward Kurtz." We turn to the page in the record cited in support of such charge. On this page, counsel for plaintiffs is cross-examining Kurtz with respect to the objections Kurtz had allegedly made to his codirectors and officers over the conduct of the corporation's affairs. The issue at this point was whether Kurtz had gone along, so to speak, with the various corporate transactions now (and allegedly then) complained of, or whether he had voiced such objection thereto that he cannot now properly be held to have acquiesced therein. "I want," said plaintiffs' counsel, "every memoranda you made at

the time you made objections." We pick up the testimony on the page preceding that cited:

"*Q*. I want every memoranda you made at the time you made objections.

"*A*. Here is one right here. There is one there. There is an Ernst & Ernst bill.

"*Q*. Let me ask you this: Is there any memoranda on there at all?

"*A*. There is my memoranda.

"*Q*. Is there any writing on there of any kind?

"*A*. No.

"*Q*. I want something you wrote on, showing that you objected. I think you and I will have to understand that. Something in your handwriting which would indicate that you objected.

"*A*. There is one in my handwriting. The date is circled. This is my ledger sheet, typed and written. That is the original. That is my writing. That is part of my records. There is some more. Here is one in here. My writing on there marked $26,541.51.

"*Q*. I will save some time. You can hold some of those. I will go over these you have here. For example, I will show you a blank sheet of paper except only on that blank sheet of paper the following, 'Per your request, Helen, check 3567, $26,451.55.' You show me anywhere any notation of your objection.

"*A*. This is—

"*Q*. You answer my question this time. You show me anywhere on there any notation of any objection on your part. Is there anything in writing?

"*A*. This is a writing of a $26,000 check, that I asked to issue at Mahlen Company and to show you the books have been in the Pastor office, and I had to request it, and there was a letter that was mailed to the—

"*Q*. We will be here for the next 3 months, if you don't answer my question.

"*A*. That is the answer to it. This is what took place.

"*Q.* You won't let me ask the question. Is there anything on there in your handwriting?

"*A.* The figures are in my handwriting.

"*The Court:* Witness, pay attention to the question and answer it. He isn't interested in your personal opinions. He wants to know what you know and not what you want to tell him. Let's get this thing going.

"*Q.* (*By Mr. Maddin, continuing*): Is there anything on this record which is in your handwriting, showing any objection on your part?

"*A.* The figures in there are in my handwriting.

"*Q.* Is there anything on there that shows any objection?

"*A.* No objection. It's my writing.

"*The Court:* Why didn't you say that in the first place? It took him 10 minutes to get that out of you.

"*Q.* I will show you this one, which is a bill from Ernst & Ernst. Is there anything in your handwriting which shows any objection?

"*A.* Nothing in my writing.

"*Q.* That is what I asked you.

"*A.* Nothing in my writing on that.

"*Q.* Now, I'll hand you all of these others you gave me and you take one at a time. Is there anything in your handwriting in this group which shows any objection?

"*A.* Yes, this is my hand.

"*Q.* That isn't what I said.

"*A.* That is my handwriting.

"*Q.* I didn't ask you that. Is there anything in your handwriting that shows any objection?

"*A.* Objections?

"*Q.* Yes.

"*A.* No, there is nothing.

"*Q.* That is the question. Is there anything on the next one?

"*A.* Nothing there as to objections.

*"Q.* So that what you have handed me is a mass of memos, but nothing in your handwriting showing any objections, is there?

*"A.* No.

*"Mr. Maddin:* Now you can have them back once more."

We find no evidence in the above of any "deep and irrepressible personal antagonism" on the part of the chancellor. Rather we have admonitions to the witness, well deserved in our opinion, that he observe with care the questions asked him and answer with accuracy. We find a few pages later in the record as follows:

*"Q.* All right, I will come back to that. After June 1, 1955, did you deposit any of these dividends in the Mahlen land account?

*"A.* I did not.

*"Q.* Did you deposit them in the Kurtz bank account?

*"A.* I did not.

*"Q.* Did you deposit them in any bank account?

*"A.* I did.

*"Q.* Whose bank account?

*"A.* Paul Kurtz.

*"Q.* I'm sorry. I forgot to put the word 'Paul.' You got me that time.

*"A.* No, I didn't get you.   *   *   *

*"Q.* (*By Mr. Maddin, continuing*) : They went into the Paul Kurtz account?

*"A.* That is right.

*"Q.* In what bank? In what bank?

*"A.* In one of the banks in the city.

*"Q.* You won't tell me, will you? I will insist upon that answer.

*"The Court:* So will I.

*"A.* Manufacturer's National Bank.

*"Q.* Who has the right to withdraw those funds?

*"A.* I have.

*"Q.* Anyone else?

*"A.* No."

A witness sworn to disclose the truth in its entirety cannot, in honesty and good conscience, reply that he did not make deposits in the "Kurtz bank account" when, as a matter of fact, as he later admits, he made them in the "Paul Kurtz" account. Our courts are entitled to a greater degree of candor than was here displayed and the incidents related do not stand alone. The chancellor, observing this witness on the stand and hearing his testimony, formed a judicial opinion as to his credibility and candor, as it was his duty to do. But, as was held in *United States* v. *Shibley*, 112 F Supp 734, 748: "Repeated rulings against a litigant, no matter how erroneous, and how vigorously and consistently expressed, are not disqualifying." Every court, and every member of every appellate court, must form an opinion as to the merits of the matter before him, often, as to the *bona fides* of the parties. This opinion, pro or con, cannot constitute bias or prejudice. It was Justice Wiest who spoke for the Court in *Crowley, Milner & Co.* v. *Macomb Circuit Judge*, 239 Mich 605, 613, in holding that "Such prejudice or bias can never be based solely upon a decision in the due course of judicial proceedings." We can read into the trial chancellor's comments nothing of personal enmity nor antagonism. If the frankly-expressed conclusion of a trial chancellor, stated in open court, that a witness before him is evasive or untruthful were grounds for reversal of his decree many cases would never reach final determination.

The vigorous expression of a ruling or opinion may, regrettably, offend a sensitive spirit whom the vagaries of a malignant fate may have forced into the hurly-burly of the legal arena. We would desire that all trial courts be irreproachable in patience, tact, wisdom, and courtesy, not only learned in the law but impervious to the vexations and irritations that plague the rest of mankind. The difficulty is

that we live in an imperfect world.  We therefore judge the actions and responses of a trial court in the light of the situation with which he is confronted. He stands in our eyes garbed with every presumption of fairness, and integrity, and heavy indeed is the burden assumed in this Court by the litigant who would impeach the presumption so amply justified through the years.  The showings made in the case before us do not persuade us of personal antagonism on the part of the trial chancellor to the defendant Kurtz, his counsel, or his cause.

We now turn to the bill of complaint, asserting a wrongful withholding of corporate assets.  Kurtz had obtained personal possession of the bulk of the corporation's assets and invested them in stocks. We are not interested at this point in whether the original acquisition of the assets was rightful, as claimed by defendants, or the result of a fraud, as claimed by plaintiffs and as found by the trial chancellor in his opinion in the contempt proceedings (later brought for Kurtz's failure to comply with the court's decree requiring restoration of such assets to the corporation, or the posting of bond, "forthwith").  The fact is that neither were the corporate assets restored nor was bond posted, and as to this there is no controversy.  As justification for such retention, Kurtz asserts that the validity of the demand upon him that he return the assets "depends upon the validity of the [annual stockholders'] meeting of May 27, 1955, and this upon freedom from fraud."  The syllogism is not impressive in the light of the facts before us.  The arguments made against the validity of the meeting, either as to its call or conduct, do not convince us, nor are we persuaded, "that the 2/3 voting control of Pastor and Geisler was oppressively used," as is asserted by defendants. Regardless, however, of the regularity of the annual stockholders' meeting of May 27th, we note that at

such meeting the same directors (including both defendants) were elected as had previously held office, and we need cite no authority to the point that an officer or director of a corporation retains office (lacking valid contrary provision in articles or by-laws) until his successor duly qualifies. The failure of defendants to attend the subsequent and regularly called meeting of the board of directors of June 3d, following, invalidated no action there taken, including the board's directions to Geisler "to obtain immediately from the former outgoing treasurer-secretary [Kurtz] all of the assets, documents, books, and papers of the corporation in his possession belonging to the corporation," which surrender, as we have seen, Kurtz refused to make, although he admits that request was made.

What was actually happening here with respect to the withholding of the assets is made clear in Kurtz's own words from the witness stand:

"*Q.* Witness, a moment ago, I asked you whether or not the reason for holding onto the assets of the company was for the purpose of using pressure to get these other stockholders to give you some extra money that you claim you had coming. Didn't you make that a condition?

"*A.* No, I wanted the proper accounting of all funds and expenditures of the corporation.

"*Q.* Didn't you say to them, the directors, that if they would settle your claims, then you would turn over the assets?

"*A.* Then they would account for the assets of the corporation.

"*Q.* You used a different word. Didn't you say if they would account for what you claimed to be improper disbursements and actions by the remaining officers and directors, then you would turn this over and not until then?

"*A.* That is right.

"*Q.* And that is your position today?

"*A*. That is my position today.

"*Q*. And you say until you are satisfied as to what your claims are you are going, are not going to turn the assets over to the company?

"*A*. Right.

"*Q*. And claims are you not going to turn these assets over to the company?

"*A*. Right.

"*Q*. And that was your position when the demand was made on you and that is still your position today?

"*A*. That is right, that is my position.

"*Q*. And it doesn't make any difference to you that the assets that you have belong to all the stockholders?

"*A*. They belong to the corporation.

"*Q*. But you are going to hold it alone?

"*A*. Until the proper accounting is given, then it will be turned over, yes."

There is no warrant for such retention of corporate assets by a director, officer, or stockholder against the will and direction of the governing body of the corporation. The fact was that Kurtz was employing tactics of self-help utterly destructive of orderly corporate administration and which, if sanctioned, would place the welfare of the stockholders of a corporation at the mercy of any disgruntled official who might succeed in capturing the corporate assets. If Kurtz had a legitimate grievance, or grievances, against the corporation or its officers, directors, or the majority stockholders, he had a forum in which he might have been heard, had he so wished. His conduct in this respect was indefensible.

The cross bill filed by defendants was "in the nature of a stockholders' derivative suit." Plaintiffs attack the validity of such proceedings on the ground that the necessary conditions precedent to the institution of such action (*e.g.,* prior demand

upon the corporation for remedial action, or showing of facts obviating necessity for same) had not been met. We will assume, *arguendo*, its validity for purposes of examination of the issues raised therein. Those stressed upon appeal concern a debt of $40,000 allegedly owed by plaintiff A. Jerome Geisler to Mahlen for topsoil, "the deposit with Mr. Maddin, said to be acting as attorney for Mahlen, of $5,000 of Mahlen's cash," alleged to be a misappropriation of corporate funds, the sale of 1-1/2 lots to the sons of Pastor and Geisler at a discount, an alleged bonus paid the H & H Construction Company for certain paving, rentals of Mahlen's property by Geisler to William G. Pastor Realty Company, allegedly unaccounted for, commissions wrongfully paid Pastor Realty Company, a shortage on lots sold, a wrongful charge to Mahlen for additional survey, and for grading made necessary by building operations, and "numerous other claims of misappropriations."

As to the burden of proof with respect to such charges, our statute (CLS 1956, § 450.13 [Stat Ann 1957 Cum Supp § 21.13]) concerning the contracts of a corporation with its directors provides as follows:

"5. No contract of any corporation made with any director of such corporation or with a partnership or other group or association of which any such director shall be a member or with any other corporation of which such director may be a member or director and no contract between corporations having common directors shall be invalid because of such respective facts alone. When the validity of any such contract is questioned, the burden of proving the fairness to the contracting parties of any such contract shall be upon such director, partnership, other group or association, or corporation who shall be asserting the validity of such contract."

It will be noted that this statute relates only to contracts made with specified individuals or groups. Of the matters before us only 2 contracts may properly be so classified, those concerning the sale of certain lots in the Valley View subdivision to the George H. Pastor Development Company, and the sale of topsoil to A. Jerome Geisler.  As to the former, claim is made that there were shortages in Mahlen's funds because of sale of lots at less than the agreed price.  The record does not sustain the charges made, save with respect to lots sold at a discount to the children of Mr. Pastor and Mr. Geisler.  Upon the record before us, however, the chancellor was justified in finding that this was approved by defendant Kurtz, who was offered the same privilege, and we will not disturb his finding.

With respect to the sale of the topsoil, it appears from defendants' exhibit 42 that in January of 1954 there was a "sale of all topsoil and Haisse loader machine" to A. Jerome Geisler for $50,000.  In this regard Kurtz testified as follows:

"I have a copy of exhibit 42.  I can tell you now [how?] I arrived at the computation of $50,000 that appears at the top of that page.  The dirt and the machine were sold to Mr. A. Jerome Geisler for the sum of $50,000.  The breakdown was $10,000 for the Haisse loader, $4,000 for the stock pile of dirt back of the office, and $300 per acre on the 120 acres makes $36,000, making a total of $50,000.  That was a sale.  That was by the direction of all 3 officers of the corporation with approval of the board of directors.

"Minutes of that meeting were kept out.  They were not recorded.  I would say that the minutes of that particular meeting I have been talking about do not appear in exhibit 1.

"The meeting took place in January before Mr. Pastor left for Florida.  It was January 5, 1954. The meeting was held on Warren avenue at Pastor

Company's office. There were present myself, Mr. Geisler and Mr. Pastor."

We note, moreover, that on June 10, 1954, at the annual stockholders' meeting, the following resolution was presented, seconded and unanimously carried, the minutes of the meeting bearing the signature of Paul Kurtz as secretary.

"Resolved, that all purchases, contracts, contributions, compensations, acts, proceedings, elections, and appointments by the board of directors since the annual meeting of the stockholders of the corporation on April 29, 1953, be and the same hereby are approved and ratified."

In view of the foregoing, defendants are in no position to complain of any alleged unfairness to Mahlen in the terms of the contract. 3 Fletcher, Cyclopedia of Private Corporations (1947 Rev), § 979. Defendants assert, however, that Mr. Geisler still owes $40,000 on this account and that such sum is still unpaid. On this aspect of the matter we note that there is a dispute as to the amount of the obligation, which we are not persuaded is frivolous, and with respect to which the trial chancellor held:

"In fact it appears that either with or without proper request on the part of the defendants or any other stockholders, steps will be taken by the Mahlen Land Corporation to obtain the relief to which it may be entitled under this claim. Therefore, no disposition is made by this court with respect to this claim but without prejudice to any of the parties in relation to the same."

In so holding there was neither error of law nor abuse of discretion. It is not the contract of sale that bears the brunt of the attack ("Kurtz has never complained of the topsoil sale," states his brief), but rather the collection of the corporate debt, or the terms of settlement thereof. These matters are

confided to the proper corporate officers and the courts will not interfere therewith in the absence of fraud, which we do not here find.

On the balance of the charges made in the cross bill the burden of proof was upon the cross plaintiffs. We have examined with care the testimony offered with respect thereto and we find it far from clear and convincing. As a matter of fact, we are constrained to comment, at this point, that we find Kurtz's testimony, taken in its entirety, to be vague, inconclusive, and contradictory. We note, moreover, that both cross plaintiffs joined in the ratification and approval of "all purchases, contracts, contributions, compensations, acts, proceedings, elections, and appointments by the board of directors" (which board included both the Kurtzes), at the annual stockholders' meetings, the trial chancellor noting with respect thereto that the last ratification and approval appeared in June of 1954 "at a date subsequent to the time when substantially all of the disbursements complained about were made." It is true that Kurtz asserts that he did not in fact approve the actions complained of, that he objected thereto, and that his objections were ignored by the majority in control of the corporations, but his assertions with respect thereto are not impressive. Thus we find in the record the following:

"*Q.* Witness, you said that you were always outvoted on the board of directors' meetings, is that right?

"*A.* That is right.

"*Q.* I fail to find a dissenting vote by you at any of these directors' meetings. How could you be outvoted if you voted for?

"*A.* Because they didn't want it in the records.

"*Q.* You voted against it but changed your minutes and voted for these things, because they didn't want it in the record?

*"A.* I didn't vote it. They outvoted me.

*"Q.* There is quite a difference, witness?

*"A.* Yes, there is.

*"Q.* If you voted negative and they voted affirmative, I assume it would be 4 to 2, wouldn't it?

*"A.* Right."

To the same point we find, among other instances, the following:

*"Q.* And the thing I pointed out to you was that you were one of the voters who voted in favor of ratifying everything that had happened prior to that time. Is there any question about that?

*"A.* There is no question about it.

*"Q.* So you did vote affirmatively to ratify?

*"A.* I don't know that I voted on it or not. I couldn't tell you right now.

*"Q.* Well, would you have signed the minutes as secretary, where it says 'unanimous'—and you are present—unless you voted for it?

*"A.* I don't recall whether I would or not.

*"Q.* Well, I am asking you now. That would be false, then, for you to sign it.

*"A.* It would.

*"Q.* Would you sign anything that was false?

*"A.* I wouldn't sign anything that was false, no.

*"Q.* So at that time it must have been correct?

*"A.* Yes.

*"Q.* Speak up.

*"A.* Partly.

*"Q.* So if it says in there that it was a unanimous vote, that includes you?

*"A.* That's right."

We come now to the matter of the contempt proceedings. Subsequent to the conclusion of the hearings and upon March 29, 1956, an order entitled, "For sale of stocks and fixing bond on stay of execution thereof" was filed in the cause, providing, in part, as follows:

"It is ordered, adjudged and decreed that Paul Kurtz forthwith sell the stocks of outside corporations listed in the schedule hereto attached forthwith and that the proceeds thereof, together with the accumulated dividends previously received by him, be forthwith deposited with the clerk of this court, Edgar Branigin, in this case, to be held by said clerk subject to the further and subsequent orders of this court, or in the alternative that said Paul Kurtz forthwith file in the office of the Wayne county clerk his surety company bond in the total sum of $175,000, the condition of which bond shall be that upon any final order, judgment or decree herein said Paul Kurtz shall, if required in said final order, judgment or decree, deliver to said Mahlen Land Corporation said stocks in outside corporations plus dividends paid thereon, and in the event that the market value of said stocks in outside corporations on the date of said delivery to said Mahlen Land Corporation shall not equal the market value of said stocks as of the date of this order determined upon the highest bid price therefor on said day as shown by the records of the New York Stock Exchange, the said Paul Kurtz shall in addition to the delivery of said stocks pay the difference between said market value thereof on said day and the market value of said stocks on the date of such delivery to the said Mahlen Land Corporation for sale, the value to be determined in the same manner as above provided, and to abide and perform any order of the court that shall subsequently be entered in this cause in relation to said securities."

A motion to set aside and vacate the above order was filed April 17th, opposed by plaintiffs and argued on April 27, 1956. At that time the following transpired:

"*Mr. Nelson:* Now, the motion here is for a modification of the order of this court, signed under date specified in the motion, ordering the sale of the stocks at a time when the point at which they are

ordered sold had passed. In other words, when we were in the court, the high for that day had already passed, as I am informed. I do not follow the stock market. But I inquired of First of Michigan and others; and I am informed that at the time that we were here, the high for that day had passed. Therefore, it was impossible to comply with the court's order.

"*The Court:* There isn't any order to sell at the high of the day. The order was that if you were going to put up a bond, that would be the measure of the bond. But that doesn't have anything to do with the selling. The selling order was forthwith.

"*Mr. Maddin:* That is all.

"*Mr. Nelson:* That is right, but we couldn't sell in accordance with the court's order.

"*The Court:* The court did not say to sell at the high. I know better than that. You have to sell it for what you can get, but you were told to sell that day. You were going to put up a bond that was to be measured by the high.

"*Mr. Nelson:* I didn't so understand the order. I understood that order, and I still understand it.

"*The Court:* Now, Mr. Nelson, you were not born yesterday. Neither was I. How could I order a man to sell at the high of the day? Who can sell at the high of the day at any time on the stock market, except by sheer luck?

"*Mr. Nelson:* You still might, if the market is open.

"*The Court:* How do you know what is going to be high for the day? Supposing you wait until the last minute of the afternoon, and then sell; and one minute later there is a higher sale. Were you wrong?

"*Mr. Nelson:* The order was not understandable. I tried to understand it.

"*Mr. Maddin:* The order didn't fix the price. It said $175,000 bond. Those are round figures.

"*The Court:* I would not tell a man to sell at the high of the day. It didn't say that.

*"Mr. Maddin:* That is his interpretation.

*"The Court:* I said that your bond would be measured by the high of the day, the amount.

*"Mr. Nelson:* That is an impossible thing.   *   *   *
(Court examines document.)

*"Mr. Nelson:* I concede that I read it hastily. That was all the time I had.

*"Mr. Maddin:* And of course it took him 20 days to discover that.

*"Mr. Nelson:* No, no. That is not so.

*"Mr. Maddin:* I mean 19. That was my error.

*"The Court* (after examining document): It is clear enough. It is like I said.

*"Mr. Maddin:* To sell forthwith, or deposit $175,-000. It has nothing to do with prices at all.

*"Mr. Nelson:* Well, it is a condition of the bond, if your Honor please.

*"The Court:* That is not what you said a minute ago."

We have examined this order in detail because of the claim to this Court that the order "was impossible of performance at the time it was signed." It was not. Compliance should have been had with such order in accordance with its terms. Sale, however, was deliberately delayed by Kurtz, who admitted that he knew he was violating the order of the court. Despite the provisions of the court's order of March 29th, approximately 70% of the stock remained unsold on September 1st, and the order under which the largest item in the group of stocks, in dollar amount, was sold, was not placed until the day before the hearing on the contempt order. The stock was ordered sold "forthwith," or bond posted, and compliance therewith (or modification upon proper showing) should have followed as a matter of course.

Before closing this opinion we are constrained to comment upon the failure of both parties to comply with the requirements of Court Rules Nos 67 and 68

(1945),* concerning page references to the supporting testimony where facts are referred to. Arguments have been made which are replete with factual assertions, particularly by appellees, which, whether material or not to the ultimate disposition of the case, should have had applicable record reference. The record before us consists of some 800 pages, the exhibits are voluminous, and the briefs of the parties total over 300 pages. Disregard of the rules imposes an inordinate burden upon the Court and it may become increasingly necessary in the future either to dismiss appeals for lack of compliance with the court rules or take other remedial action. *Miller* v. *Allen,* 352 Mich 95; *Wilks* v. *Kempf,* 352 Mich 445, 451; *McGuire* v. *Rabaut,* 354 Mich 230, note, page 234; *Greenough* v. *Greenough,* 354 Mich 508, 521–528.

In view of what has been held heretofore, there is no need to comment upon additional issues raised. We find no exceptional circumstances warranting equity's dissolution of Mahlen. See *Stott Realty Company* v. *Orloff,* 262 Mich 375.

The decree of the trial chancellor, the order adjudging defendant Paul Kurtz in contempt, and the sentence made with respect thereto are affirmed. Costs to appellees.

Dethmers, C. J., and Carr, Kelly, Black, Edwards, Voelker, and Kavanagh, JJ., concurred.

---

* As amended 1956. See 347 Mich xxii–xxiv.—Reporter.